# IOWA APARTMENT HOUSE COMPANY *v.* HERSCHEL.

---

LANDLORD AND TENANT; DIRECTION OF VERDICT; DAMAGES.

1. Where it is provided in a lease of an apartment in an apartment house, containing a central steam heating plant heating the entire building of many apartments, and which is controlled and operated by the owner, that the landlord will provide steam heating for the demised apartment, it is the duty of the landlord to provide, keep in repair, and properly and reasonably inspect the steam radiators in such apartment.

2. In an action by the lessee of an apartment house containing a central steam heating plant, controlled and operated by the owner, against the owner, for damages to the lessee's household effects during his absence, caused by steam escaping through open valves in the radiators, it is not error 'or the trial court to refuse to direct a verdict for the defendant, where it appears, among other things, that the lease provided that the landlord should furnish steam heating for the apartment and have right of access thereto to make necessary repairs, and that the tenant should surrender the apartment at the end of the tenancy in the same good order as when demised, ordinary wear and tear and damage by the elements excepted; that

the lessee in the early autumn closed his apartment and left the city after notice to the owner, who had means to enter it; that the lessee left the air valves in the radiators open and in the same condition they were in the spring when the steam was turned off, and adjusted in accordance with the landlord's instructions, and that the steam was turned on during the lessee's absence, and resulted in the injury complained of.

No. 2161.   Submitted November 2, 1910.   Decided March 6, 1911.

HEARING on an appeal by the defendants from a judgment of the Supreme Court of the District of Columbia, on verdict, in an action for damages to personal property.       *Affirmed.*

The COURT in the opinion stated the facts as follows:

Appeal from a judgment of the supreme court of the District of Columbia in favor of plaintiff in an action for damages to the goods of the plaintiff by reason of escaping steam from heating apparatus in an apartment "including steam heating," leased by the defendants to the plaintiff.

The undisputed facts are that the defendants, the Iowa Apartment House Company and the McLachlen Banking Corporation, were, at the time of the occurrences giving rise to this suit, Virginia corporations, having their principal offices and doing business in this District; that one of them, the Iowa Apartment House Company, was the owner of the Mendota apartment house, situate at Twentieth street and Kalorama avenue in this city, and that the McLachlen Company was its agent for the purpose of leasing apartments in the Mendota; that through the agency of the McLachlen Company, apartment 23 in the Mendota was leased to the plaintiff, Arthur H. Herschel; that during the time plaintiff was lessee of this apartment, and while he was absent with his family from the city, and his apartment temporarily closed, escaping steam from the radiators and pipes connected with the heating apparatus installed in the building did considerable damage to the goods of the plaintiff in said apartment.

Plaintiff's declaration was in three counts.  Count 1, besides

setting out the facts above given, alleged "that the Mendota apartment house contains numerous apartments, including apartment No. 23, leased to the plaintiff, as aforesaid, and which, together with other portions of the building, are heated by steam heat, through a central heating plant, operated, controlled, and managed by the defendants and their agents and employees; that on or about the 17th day of September, 1908, the plaintiff notified the defendants, through their duly authorized agent, Mr. —— Drum, the superintendent of the Mendota apartment house, that he was leaving the city of Washington, District of Columbia, for the period of about one month; that the plaintiff did leave the city, and during his absence the defendants, their agents, servants, or employees, negligently and without reasonable care as to the condition of the radiators, pipes, and appliances in apartment No. 23, leased and occupied by the plaintiff, as aforesaid, started fires in the furnaces and put the said heating plant and its appliances into operation; and that through such negligence of the defendants, their agents, servants, or employees, and without any negligence or fault on the part of the plaintiff, large quantities of steam and water escaped from the radiators and appliances in apartment No. 23, of said Mendota apartment house." Resulting damage was then alleged. Count 2 mentioned a lease of said apartment for the year previous to the lease relied on in the first count, and further alleged "that under the terms of said written lease, the defendants agreed to furnish the plaintiff with steam heat; that it then became the duty of the defendants to keep the heating plant and all the apparatus and appliances connected therewith, including the radiators, pipes, and appliances in the said apartment No. 23, in proper repair, and to take every due and reasonable care and precaution to provide against injury to the plaintiff or his property; that the defendants failed to keep the radiators, pipes, and appliances in said apartment No. 23 in proper repair, and as a consequence thereof the grievances hereinafter mentioned occurred." The third count was not materially different from the others.

At the trial plaintiff testified to the effect that he occupied said apartment from May, 1907, to September 30th, 1909. He placed in evidence a written lease running from October 1st, 1908, to October 1st, 1909. This lease covered said apartment No. 23 and storage room, *"including steam heating,"* and was in part as follows: "The party of the second part (plaintiff) * * * will, at the end of said term, deliver up the said apartment and storage room, in the like good order in which they now are, ordinary wear and tear and damage by the elements only excepted. * * * The party of the first part (defendant) may enter said apartments at any reasonable hour, to make any necessary repairs, or to protect said apartments against the elements." Plaintiff further testified "that he left for a trip to Jamaica on September 17th, 1908, and returned October 15th, 1908; that he notified the McLachlen Banking Corporation, who were the only people he knew in the matter of renting the apartment, that he would be gone past the first of the month, and arranged about his rent; that the day he left he told Mr. Drum, the superintendent, he was to be gone about a month; that Mr. Drum let him in his apartment one day when he had left his keys in the apartment." Plaintiff then offered in evidence a letter received by him from the McLachlen Company under date of October 7th, 1908, informing him that on October 6th "the attention of the superintendent was called to a small wet spot on the ceiling of the room of the apartment below yours. * * * He and the carpenter made an immediate inspection of your apartment. * * * It was found that the apartment had been filled with steam during several days after the heating plant had been put in operation. * * * Examination of your air valves on the radiators showed that they had all been left open. Possibly you can account for this. We cannot, for such valves are only used for an instant at a time to let out air, and must then be tightly closed. It was also found that the steam valve in the kitchen from, which the radiator has long been removed was partially open. * * * The front door and several windows are swelled too tightly to be opened at present." Plaintiff

further testified that "he had some trouble with water collecting in the radiator and not heating, and for that reason Mr. Drum instructed them to leave the valves open, and that they left them open just a little, so very little stream would come out, and that they had been left open that way during his occupancy the preceding winter; that there was a pipe in the kitchen from which the radiator had been removed which had a wheel cut-off or valve; that there was a cap screwed on after the accident; that when the steam was last turned on in the spring there was no escape of steam from this pipe, and no escape of steam, save a very small quantity, from the little air valve, which never caused any inconvenience or damage; that the valves were untouched after steam was turned off in the spring;" that "the radiator in the kitchen was taken off before he went into the apartment, and when asked if he wanted it put back, said no; that if the valve on the radiator was turned tight, no steam could escape, and he had it turned off tight during the previous winter and spring, and no steam escaped then; that if it was turned partially, so that steam escaped, he did not know how it became turned."

The witness further testified that their servant had no orders to go into the apartment during their absence, and had no right to be there during that time. Plaintiff's wife testified that "Mr. Drum told them to leave the air valve turned on just a little;" that she took the key to the premises away from her servant before she went to Jamaica; that "she did not wish the servant to do anything at the apartment during her absence." On cross-examination witness testified that this servant "was a temporary servant, doing the laundry work;" that witness "usually took the key away from the servant," but upon a different occasion had left the key with her.

Defendants produced as witnesses the superintendent of the Mendota and a carpenter employed there, both of whom testified as to finding steam escaping through the valves of the radiators on October 6th. The superintendent gave evidence tending to prove "that he knew Mr. Herschel was going away; that he had charge of the heating arrangement; that it was

impossible to isolate the plaintiff's apartment so far as heat is concerned without cutting off all the apartments on that corner." The witness did not deny that he instructed plaintiff and his wife to leave the air valves partially open, nor were the statements of those witnesses on this point met by any evidence whatever.

The superintendent further testified "that a colored woman, called Mrs. Hawkins, was in plaintiff's apartment cleaning up after the plaintiff left for Jamaica," and that she had a little boy with her, who was about five years old. The hall boy at the Mendota, who knew said servant girl, testified that he remembered the occasion of the plaintiff's going away in the fall of 1908, and that he saw said servant girl in the apartment twice during plaintiff's absence, but did not see anyone with her.

The defendants moved for a directed verdict, which motion was overruled. The defendants thereupon, in substance, requested the court to charge the jury (1) that it was the duty of the plaintiff, upon the discovery of any defect or want of repair in said heating appliances, to notify the defendants; and that, in the absence of such notice, or of knowledge from other sources, the defendants were not guilty of negligence in turning on the steam heat; (2) that the failure of the plaintiff to examine the steam cut-off and air valves before his departure constituted contributory negligence; (3) that if it was the duty of the defendants to make repairs at all, such duty did not arise "until after notice or knowledge" of some defect likely to cause injury to the plaintiff; (4) that it was the duty of the plaintiff, "if the pipes, steam radiators, and appliances were in good condition when plaintiff leased said premises," to keep them in good condition, and that defendants were not responsible if injury resulted from his failure so to do; (5) that if damage was occasioned by reason of steam escaping from open valves which should have been closed, the plaintiff could not recover. [These requests for instructions were denied.]

Thereupon, the court charged the jury in part as follows, which was the only portion of the charge to which the defend-

ants excepted: "If, by the lease which has been offered in evidence, the defendant agreed to furnish the plaintiff with steam heat, then it was obliged to furnish him the steam heat. That obligation carries with it the necessity on the part of the defendant of keeping the paraphernalia necessary to the supply of steam heat in a condition of repair which was reasonable for the rendition of the steam-heat service. The lease reserves to the defendant the right to enter the plaintiff's apartment, at any reasonable hour, to make any necessary repairs. The obligation to make repairs carries with it an obligation of inspection and examination, in order to ascertain whether any repairs have to be made. \* \* \* If you find, therefore, that the duty which the situation of fact, with all its environment and circumstances, was such that a reasonably prudent man would have inspected and entered the apartment to do it, and that the result of that inspection would have disclosed the condition which brought about this loss, and that therefore the loss was occasioned by a failure of inspection, then that would constitute negligence on behalf of the defendant. If, however, on that point you find that a man of reasonable prudence and caution would not, under all the circumstances, have entered the premises for inspection, then there is nothing else in the case which would justify you in finding that the defendant was negligent, and it would then be your duty to bring in a verdict in its favor." The remaining portion of the charge very fully covered the question of negligence on the part of both parties.

*Mr. B. F. Leighton* and *Mr. E. H. McLachlen* for the appellants.

*Mr. Jackson H. Ralston, Mr. Frederick L. Siddons,* and *Mr. William E. Richardson* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

1. Did the court err in denying the defendants' motion for a directed verdict? It may be conceded as a general proposi-

tion that, in the absence of statute or express covenant or stipulation in the lease, there is no obligation on the part of the lessor to make ordinary repairs on the leased property. 24 Cyc. Law & Proc. p. 1081. But we are not dealing with an ordinary tenancy. The tenancy here relates to an apartment house, —a class of tenancy of comparatively recent origin, and one which, in some respects, at least, is to be distinguished from other classes.

The demised premises, by the express terms of the lease, included "steam *heating;*" and the defendants reserved the right to enter the premises at any reasonable hour, "*to make any necessary repairs.*" The "steam heating" referred to in the lease was a part of the heating system for the entire building of many apartments. The central plant of this system was located in the building, and the pipes which supplied plaintiff's apartment supplied heat to apartments above and below him. This entire system was, of course, under the exclusive care and control of the defendants, who, however, insist that it was the duty of the plaintiff to keep in repair steam pipes, radiators, and appliances in his particular apartment. We cannot assent to this proposition. We think it clear that the obligation to furnish steam *heating* carried with it the duty of providing and maintaining the means for the proper fulfilment of that obligation. We think this view is sustained by the record. Obviously steam heating could not be furnished unless means were provided. A naked agreement on the part of a dairyman to supply milk would not require him to provide his customers with a receptacle for it when delivered; but there is some difference between milk and steam. The defendants did provide means for fulfilling their contract, and when complaint was made to their superintendent as to the radiators in this apartment, the superintendent did not maintain that the defendants were not responsible therefor, but instructed the plaintiff how to adjust the valves, that the difficulty might be overcome. It was in evidence that there was no way to cut off steam from this apartment without also affecting all other apartments in that section of the building. Is it reasonable to suppose that the

defendants intended to permit the plaintiff to exercise any control over the main steam pipes in his apartment, and thus interfere with the heating of other apartments? If the plaintiff was to have no control over steam pipes, why was he to be permitted or required to keep in repair the radiators? He was paying for steam *heating*, and under his lease he had every reason to assume that the means for furnishing that heating would be kept in repair by his landlord. In fact, the term "heating" is itself suggestive of means as well as heat.

In *Bryant* v. *Carr*, 52 Misc. 155, 101 N. Y. Supp. 646, the court, after stating the general rule, said: "But it is nevertheless well settled that the duty of the landlord extends to keeping in proper repair all portions of a building, including fixtures not exclusively demised to a tenant. * * * The application of this principle is entirely irrespective of the rights of the tenant dependent upon a covenant to repair. * * * The scheme of heating the building generally, and the apartments therein separately, was, upon the evidence, it is fair to assume, a general scheme, devolving upon the landlord." The reasoning in that case is applicable here.

The duty of keeping in proper repair the means whereby steam heating was furnished to the plaintiff necessarily included the duty of proper and reasonable inspection. It must, of course, be conceded that if a tenant, knowing of the immediate necessity of repairs and the landlord's ignorance of that fact, failed to notify the landlord, and suffered damage to result, the tenant would be estopped to take advantage of his own negligence; but that is quite different from saying that the tenant is charged with the duty of general observation and inspection in this connection. As already pointed out, the central heating plant and all the conducting pipes are admitted to be exclusively within the landlord's control. It would be unreasonable to hold that the tenant, who is without power over such plant, should in all cases be estopped to claim damages from the landlord for failure to give notice of the need of repairs which sometimes might be rendered necessary by the negligent operation or unskilful control of said central heating plant.

Futhermore, the familiarity of those in charge of said plant with its general operation and control would naturally render an inspection by them of that part of the heating system located in an apartment much more satisfactory and complete than an inspection by the ordinary tenant, who might fail to observe a defect requiring immediate attention, and which would be apparent to one acquainted with the construction and working of the heating system as a whole.

In *McKeon* v. *Cutter,* 156 Mass. 296, 31 N. E. 389, relied upon by the defendants, the facts were materially different from those in this case.  There the plaintiff's tenement was in a house containing three other separate tenements, and was supplied with cold water by a pipe leading from the main street, and with water to supply the hot water boiler, connected with plaintiff's kitchen range, from a tank in the attic.  The suit was for damages caused by water leaking from pipes in plaintiff's tenement.  It appeared that these pipes were for the exclusive use, and under the exclusive possession and control, of the tenant; and in the absence of any covenant requiring the landlord to keep them in repair, it was held that such duty devolved upon the tenant.  It does not even appear that the landlord in that case covenanted to furnish the tenant with water. Nor does it appear that there was any clause in the lease indicating that the landlord was to make any repairs upon the demised premises.

*Whitehead* v. *Comstock,* 25 R. I. 423, 56 Atl. 446, also cited by the defendants, is not in point.  In that case the plaintiff claimed damages for an injury sustained by slipping and falling upon ice in the cellar of the tenement leased of the defendants, the condition of said cellar being the result of a defective water pipe.  There was no allegation "that the defendants agreed to keep the premises in question in repair, or that they agreed or promised to do anything in connection with the use thereof by the plaintiff except to provide him with water, and this they did."  The distinction between that case and the present is apparent.

It is insisted, however, that the plaintiff, by his acts of omis-

sion or commission, contributed to the damage for which he sues, and hence that he cannot recover. The plaintiff testified that the air valves in the radiators were left exactly as they were when the steam was turned off in the spring, and that they were adjusted in accordance with instructions from defendants' superintendent; that the valve in the pipe which had supplied the kitchen radiator was also untouched after steam was turned off in the spring, and that *after the accident* defendants screwed on a cap to the end of this pipe in place of the valve. The plaintiff further testified, and this testimony was not denied, that upon one occasion defendants' superintendent had let him into his apartment, plaintiff having left his keys in the apartment. It was admitted that plaintiff notified one of the defendants that he was going away, and that he then arranged about his rent. The plaintiff testified that he also notified defendants' superintendent that he was to be gone about a month. This statement the superintendent did not deny. From the letter of the defendants to the plaintiff it appears that the heating plant had not been put in operation when the plaintiff went away; in fact, it is apparent from that letter that it must have been at least two weeks after plaintiff's departure before steam was turned on. Having every reason to believe that the defendants were provided with means to enter his apartment; that he would be away when the steam plant was put in operation; having no knowledge of any special defects in the heating appliances in his apartment, and knowing that it was the duty of the defendants to keep in reasonable repair and make proper inspection of such appliances, we think it was for the jury to say whether the plaintiff was chargeable with negligence in that respect. This was the view entertained by the learned trial justice.

Judgment affirmed, with costs.